[Cite as *State v. Shartle*, 2025-Ohio-564.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

STATE OF OHIO                          :
                                       :
    Appellee                           :   C.A. No. 2024-CA-8
                                       :
v.                                     :   Trial Court Case No. CRB2301056
                                       :
ANDREW S. SHARTLE                       :   (Criminal Appeal from Municipal Court)
                                       :
    Appellant                          :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on February 21, 2025

. . . . . . . . . . .

COLIN P. COCHRAN, Attorney for Appellant

NATHANIEL W. ROSE, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Andrew S. Shartle appeals from his conviction for assault. Shartle asserts his conviction was against the manifest weight of the evidence

because the State failed to disprove his claim that he acted in self-defense.

**{¶ 2}** Because there was competent, credible evidence in the record upon which the jury could have reasonably concluded that Shartle committed the offense of assault, and because Shartle has failed to demonstrate that the jury lost its way in rejecting his claim that he acted in self-defense, we affirm.

## I.      Facts and Procedural Background

**{¶ 3}** On September 6, 2023, Shartle assaulted the victim, D.M., by spraying him in the face with pepper spray.   At the time of the assault, Shartle, his wife, and their three children lived in a rental property in Fairborn, Ohio, that was managed by JL Zimmerman Realty Company ("Zimmerman").   D.M. was an independent contractor hired by Zimmerman to perform lawnmowing and general yard upkeep of the properties under its management.   There is no dispute that, under the terms of the lease agreement for the rental property, D.M. was permitted to be on Shartle's rental property for the purpose of providing yard maintenance.

**{¶ 4}** Following the assault, Shartle was arrested and charged with assault in violation of R.C. 2903.13.   The matter proceeded to a jury trial.   Shartle's defense centered on his claim that he had acted in self-defense.   The jury rejected the claim of self-defense and found Shartle guilty of assault.   The trial court sentenced Shartle to a jail term of 45 days.

**{¶ 5}** Shartle appeals.

## II.     Manifest Weight

{¶ 6} Shartle's sole assignment of error states:

THE TRIAL COURT ERRED IN CONVICTING SHARTLE WHERE SUCH CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 7} Shartle contends the evidence demonstrated that he acted in self-defense, and, given this, his conviction was against the manifest weight of the evidence.

{¶ 8} Self-defense involving the use of non-deadly force requires evidence that: (1) the defendant was not at fault in creating the situation giving rise to the altercation; (2) the defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm; and (3) the only means of protecting himself from that danger was by the use of force not likely to cause death or great bodily harm. *State v. Coleman*, 2018-Ohio-1951, ¶ 13 (2d Dist.). When a defendant presents evidence at trial tending to support that he used force in self-defense, the State must then prove, beyond a reasonable doubt, that the defendant did not act in self-defense. R.C. 2901.05(B)(1). To prevail, the State need only disprove one element of a self-defense claim. *State v. Knuff*, 2024-Ohio-902, ¶ 191.

{¶ 9} The Ohio Supreme Court has held that the State's self-defense burden is "subject to a manifest-weight review on appeal." *State v. Messenger*, 2022-Ohio-4562, ¶ 27; *see also State v. Butler*, 2023-Ohio-3504, ¶ 17 (2d Dist.). When a conviction is

challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 10} "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist.).

{¶ 11} With the foregoing standards in mind, we address Shartle's challenge to the jury's determination. In his defense, Shartle testified on his own behalf and also presented the testimony of his wife and daughter. According to their collective testimony, the family began to experience problems with D.M. prior to the events of September 2023. The family testified that the prior encounters with D.M. caused them all to fear D.M. Specifically, they claimed that D.M. had cut down one of their tomato plants and that he had sprayed "poison" in the vegetable garden and in areas where the children and dog

played. The testimony indicated that the "poison" was a weedkiller spray that D.M. used on one occasion in the yard. According to the testimony, the spray caused the children to suffer gastrointestinal illness.

{¶ 12} The family also testified that D.M. had previously assaulted Shartle's wife by purposely using a leaf blower to blow rocks and debris toward her. Shartle's wife testified that a rock hit her in the leg causing a "big old bruise." She also testified that a rock hit the dog during the same incident, and that D.M. just "smiled and smirked." She further testified that she "looked at his record" and discovered that he had a prior felony conviction.[1]

{¶ 13} According to the Shartles' testimony, in the weeks prior to the pepper spray assault, D.M. began to come onto the rental property "more than usual for lawn care, sometimes multiple times per week, despite the fact that there was no grass to be cut because it was August and September." Shartle and his wife testified that they believed Zimmerman was "sending D.M. to their property to agitate the Shartles and attempt to provoke the Shartles into taking action that Zimmerman Realty could use to evict them." They also testified that they had voiced their concerns to Zimmerman and to the police. Finally, Shartle's wife testified that she sought a protection order against D.M.[2]

{¶ 14} Shartle testified that on the day of the offense, D.M. blew gravel and dirt toward him. According to Shartle and his wife, D.M. caused a rock to hit Shartle in the

---

[1] In his appellate brief, Shartle contends that D.M. had "multiple violent felonies on his record." However, the record demonstrates that D.M. had one prior felony conviction for a 2013 domestic violence offense.

[2] According to the record, an ex parte temporary protection order was issued on September 15, 2023; it was dismissed following an evidentiary hearing.

head. Shartle also testified that his legs were hit with gravel and debris at least twice. After that, Shartle went into the house. He testified that he wanted to check on the children, who were screaming and crying in fear. He further testified that he then returned to the yard and walked toward D.M. Shartle testified that he used the pepper spray because, as D.M. turned toward him, he did not know what action D.M. might take with the leaf blower. Shartle testified that the pepper spray had been in his pocket during the entirety of the encounter.

{¶ 15} In contrast to Shartle's version of events, Alexandria Logan, a neighbor, testified that Shartle was the "initial aggressor" during the encounter. She also testified that she had noticed Shartle "get aggressive" toward D.M. approximately two weeks prior to the offense. She testified that she had been outside on the day of the assault; she observed Shartle approach D.M., and she then heard Shartle say "get off my property." She then heard D.M. say "please let me do my job." According to Logan, D.M. then started his leaf blower. She testified that the blower was pointed toward the ground. She saw D.M. walk toward the back of the property and then heard him scream. Logan called the police and began to tend to D.M.

{¶ 16} D.M. testified that he provided yard maintenance for 52 properties managed by Zimmerman. He asserted that, on the day of the assault, no one was outside when he arrived at the Shartle residence. He began to use a "weed eater" in the yard, and after a few minutes, he turned around and was confronted by Shartle. According to D.M., Shartle was angry so, in compliance with instructions from Zimmerman, D.M. used his cell phone to record the interaction. D.M. testified that, when he began to use the leaf

blower to clean up grass clippings, Shartle confronted him and kept ordering him to get off the property. D.M. walked around Shartle with the leaf blower pointed away from Shartle. As D.M. walked toward the back of the property, he noted that Shartle's wife had stepped outside onto a porch; D.M. pointed the blower away while he walked past her. D.M. noticed Shartle enter the residence. After D.M. finished using the blower on the driveway, he began to turn around, at which point Shartle sprayed him in the face with pepper spray.

{¶ 17} Fairborn Police Officer Seldon Patterson testified that he responded to the scene following Logan's call to 911. Contrary to Shartle's testimony at trial that he had had the pepper spray in his pocket during the entirety of the events that day, Shartle told Patterson that day that he had gone into the house to retrieve the pepper spray.

{¶ 18} D.M.'s video of the encounter was introduced by the State. At the start of the video, Shartle was standing directly in front of D.M. Shartle began to gesture and stated "you have three seconds to get off my property." D.M. walked away and began to use the weed eater. At that point, Shartle walked to his porch, where he stood with his wife. After D.M. finished with the weed eater, he walked back down the driveway toward the road, and Shartle stood in the driveway. After D.M. passed by Shartle, Shartle told D.M. that he was not allowed to be on the property. Shartle also stated, "this is provoking." D.M. walked to his work trailer and retrieved his riding lawnmower. Shartle moved his trashcans from the roadway into the driveway. Once the mowing was finished, D.M. drove the lawnmower back into his trailer. He then retrieved a leaf blower, walked back to the property, and began blowing grass clippings. Shartle was depicted

standing in the driveway while D.M. repeatedly stated, "excuse me, so I can do my job." When Shartle failed to move, D.M. walked around him and continued to use the blower. Eventually, D.M. reached the back of the property. D.M. then turn around with the blower motor disengaged. As D.M. turned, the video showed Shartle behind him, and D.M. began to scream.

{¶ 19} Self-defense claims generally involve the issue of witness credibility. *State v. Campbell*, 2024-Ohio-1693, ¶ 32 (8th Dist.). " 'Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.' " *Id.* "When weighing witness testimony supporting a claim of self-defense, the trier of fact is 'free to believe or disbelieve the testimony of the witnesses' and 'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.' " (Citations omitted.) *Id.*

{¶ 20} Based upon the above-cited evidence, the jury could have reasonably concluded that Shartle was at fault in creating the situation, as he was the one to initiate contact with D.M. The evidence also demonstrated that Shartle followed D.M. around the yard.

{¶ 21} Further, Shartle did not claim that he was not able to stay safely in his home. He admitted that he left D.M. in the yard and reentered his home, and was not afraid that D.M. would attempt to enter the house. Thus, the jury could have reasonably concluded that using pepper spray was not Shartle's only means of protecting himself.

{¶ 22} Most importantly, a reasonable jury could have concluded that Shartle's own testimony belied his claim that he was in fear of imminent danger of bodily harm

when he used the pepper spray. Specifically, Shartle admitted that his "fear" centered on his belief that D.M. might "poison" his vegetable garden and damage his vehicles rather than on his belief that he was in imminent danger of bodily harm. It was this "fear" that led him to exit his home and watch D.M.'s actions. However, Shartle admitted that D.M. did not have any weedkiller on the day of the incident. Additionally, while Shartle testified that he observed D.M. blowing rocks onto his car, he admitted that this made him angry rather than scared. Indeed, Shartle stated, "that's what pissed me off even more."

{¶ 23} The testimony from Shartle's wife and daughter also belied the claim that Shartle was in imminent fear of bodily harm. Indeed, when asked whether Shartle had feared D.M., Shartle's wife stated that Shartle was an "ex marine [who] can take care of himself." The daughter also testified that Shartle had not been afraid of D.M.

{¶ 24} Although the parties disputed what occurred at the time of the offense, based on the video evidence and the testimony presented, the jury reasonably could have concluded that Shartle had not been in fear of imminent danger of bodily harm when he used pepper spray on D.M. Consequently, we cannot conclude that the jury clearly lost its way in rejecting Shartle's claim of self-defense. Accordingly, the assignment of error is overruled.

### III.    Conclusion

{¶ 25} Shartle's sole assignment of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.